**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANNIE R. LANG,                    )
                                  )
            Plaintiff,            )    Case. No. 11 C 5949
        v.                        )
                                  )    Magistrate Judge
Michael J. Astrue,                )    Arlander Keys
Commissioner of Social            )
Security                          )
            Defendant.            )


**MEMORANDUM OPINION AND ORDER**

This case is before the Court on Annie Lang's motion for

summary judgment.  She seeks a remand or an outright reversal of

the Commissioner's decision to deny her application for

Disability Insurance Benefits and Supplemental Security Income.

For the reasons explained below, her motion is granted and the

case is remanded to the Commissioner for further proceedings.

Background & Procedural History

On February 29, 2008, plaintiff Annie R. Lang applied for

Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI"), alleging that she became disabled as of October

5, 2004 because of back and neck pain.  Her application was

denied initially and upon reconsideration.  Ms. Lang requested a

hearing before an administrative law judge, and the case was

assigned to ALJ Jose Anglada, who held the requested hearing on

May 18, 2010.

At the hearing before the ALJ, Ms. Lang appeared, represented by counsel. She testified that she was born on April 27, 1944, making her 66 years old at the time of the hearing. Record at 37. She testified that she was divorced and lived in her own home, with her daughter and her four grandchildren, ages 11, 14, 17 and 20. Record at 38-39. She testified that she lives on her CNA pension, which is about $218/month, and social security income, which is about $1,035/month (gross). Record at 39-40.

With regard to her work history, Ms. Lang testified that she worked for CNA Insurance Company for nine years, until 1995, when the company laid her off. Record at 40-41. At CNA she served as a licensing clerk. She testified that, after she got laid off from CNA, she went to college and earned a bachelor's degree in sociology. Record at 40-41, 74-75. She testified that she also worked at the University of Illinois, in an outreach program to assist the parents of disabled students. Record at 43-44. Ms. Lang testified that she hurt her back while working at the University of Illinois outreach program job, and was forced to quit because she could no longer do the work. Record at 45-46. She testified that she then worked for Public Storage, but that she was involved in a car accident in November of 2004, which aggravated her back injury and left her unable to do that job as

2

well.  Record at 45.  She testified that, after the accident, she did not go back to work; she tried briefly but was unable to do the work so she quit. Record at 49.

Ms. Lang testified that, after her car accident, she had a lot of pain in her face, neck, back, lower back and legs.  Record at 51.  She testified that her doctor prescribed pain medication, which helped.  Record at 51. She testified that, over time, her medication was "reduced" and that she now takes Tramadol and Naprosen.  Record at 53.  She testified that her primary care physician, osteopath Jason Smith, treated her after the accident, and that she sees him regularly, about once a month.  Record at 50, 56, 58.  She testified that, right after the accident, she saw Dr. Smith several times a week.  Record at 66.  She testified that Dr. Smith referred her to an orthopedic surgeon, Dr. Charles Slack, who recommended that she have surgery; she declined to do so.  Record at 57.  Instead, she pursued steroid injections, physical therapy, massage and heat treatments.  Record at 57-58.

Ms. Lang testified that she is generally able to manage with her prescribed medication, and that her medication gives her "a little relief".  Record at 59-60.  But, she testified, sometimes (especially when it's very cold out) her pain gets so bad she can barely get out of bed, then she goes to get "a shot of something." Record at 59.  She testified that her medication

3

sometimes makes her dizzy and gives her stomach pains; otherwise, there are no side effects from her medication.  Record at 60.

With regard to her daily routine and abilities, Ms. Lang testified that she typically gets up about 6:30 in the morning, takes care of her "bodily needs" and then gets back into bed. Record at 60.  She testified that she gets up again about 9 or 9:30 a.m., fixes something to eat and takes her medication. Record at 61.  She testified that she cooks one or two meals a day, quick easy meals like boiled chicken or noodles.  Record at 61.  She testified that she is unable to do many of her household chores, maybe washes a few dishes and does some laundry – with assistance from her grandchildren, who carry the laundry up and down the stairs for her.  Record at 61-62.  She testified that she will sometimes make her bed, but that her grandchildren do the cleaning around the house.  Record at 62.  Ms. Lang is able to drive; indeed, she testified that she drove herself to the hearing.  Record at 37-38.  She testified that she spends "quite a bit" of time in bed each day and lies down four or five times a day for 30 to 90 minutes at a time.  Record at 62-63, 67.  She testified that lying down helps get "the weight off" her legs, back and neck.  Record at 67.

Ms. Lang testified that she also gets headaches every day, sometimes they cause sharp pain and sometimes they cause dull

4

pain.  Record at 67.  She testified that the pain makes it hard for her to concentrate and focus.  Record at 68.  She testified that she goes to bed for the night about 10:00 p.m.  Record at 63.  She testified that she takes Tramadol at night so that she can "really rest" and, if her pain is especially bad during the day, she takes Naprosen. Record at 63.

With regard to her limitations, Ms. Lang testified that she can carry, at the most, two to four pounds, she can walk about two blocks at a time and can sit for about 35 to 45 minutes at a time.  Record at 64.  She testified that she mostly just watches tv, listens to music and reads.  Record at 64.  She testified that she sometimes goes out to eat or to the movies with her family.  Record at 64-65.

The ALJ also heard testimony from Glee Ann Kehr, a Vocational Expert who had reviewed Ms. Lang's work record and her exhibit file and heard Ms. Lang's testimony before the ALJ. After asking some clarifying questions, the VE determined that Ms. Lang's job with CNA involved mostly sitting at a desk and handling paperwork; she testified that a hypothetical person with limitations similar to those experienced by Ms. Lang would still be able to perform the licensing clerk job – at least as Ms. Lang performed the job (i.e., with the ability to sit or stand). Record at 76-77.  The VE testified, however, that if Ms. Lang

were required to take rest breaks during the day that caused her to be "off-task" then she would be unemployable. Record at 77. The VE also testified that, if the hypothetical person were limited in the bilateral use of her hands, fingers and arms for grasping, fine manipulations and reaching, then her past work would be precluded. Record at 80. The VE also testified that, if the January 26, 2010 report from Dr. Jason Smith were accepted as true (that is, if attention and concentration were impaired on a frequent basis, with frequent defined as 34 to 66 percent of the time), then competitive employment would similarly be precluded. Record at 82. The VE also testified that, if Ms. Lang were required to be absent from work four days per month – or anything more than one day per month – then employment would be precluded. Record at 82.

In addition to the testimony of Ms. Lang and the VE, the record before the ALJ also includes an abundance of medical records. Though Ms. Lang claims a disability onset date of October 2004, the record makes clear that she suffered from back and neck pain long before that. Ms. Lang had a comprehensive physical examination on August 7, 2001; at that time, she was 5'4" tall and weighed 200 lbs. Record at 352. She completed a "well-being chart," checking boxes to identify her symptoms; she checked irritability, restlessness, sweating, dizziness/light

6

headedness, insomnia/trouble sleeping, fatigue-lack of energy, weakness, sleeping too much, seeing or hearing things that are not real, eye pain, sinus pain, chest discomfort, heartburn, nasal congestion, hay fever, and shortness of breath. Record at 347. To address some of these concerns, it was recommended that she undergo a sleep study and that she make some changes in her diet. Record at 353. X-rays and scans taken that same day (August 7, 2001) indicate no fractures or dislocations in the temporomandibular joints and "minimal degenerative change of the thoracic spine" but "extensive degenerative changes of the cervical spine from C4 to C7; more specifically, the report notes that there "is a narrowing of the intervertebral disc spaces from C4 to C7 with large, osteophytes along the vertebrae at these levels. There is encroachment of the foramina at C5-C6 and C6-C7. No fracture line of dislocation is seen." Record at 304. Facet joints were normal. Record at 304.

The record also includes treatment notes and records from Dr. Jason Smith, Ms. Lang's treating osteopath and physical therapist. These records show that, after her examination in August of 2001, Ms. Lang was prescribed and sought physical therapy with Dr. Smith to address pain and spasms she was having in her back and neck; she had sessions on August 14, 16, 21, 23, and 30, and on September 6, 2001, with noted improvement on the

7

23rd and the 30th.  Record at 354-355.  Dr. Smith also recommended that she do a sleep study, which she did on October 12, 2001.  Record at 356-359.

She saw Dr. Smith again on November 7, 2001 and November 15, 2001.  Record at 360.  She saw him again on February 25, 2002, complaining of pain and discomfort at work; she reported that she was currently off work for physical therapy.  Record at 382.  On examination, her straight leg raising was within normal limits; her paravertebral and flank muscle mass was "spastic and tender to light palpation."  Record at 382.  She saw Dr. Smith regularly, with several sessions each month from February 25, 2002 through May 30, 2002.  Record at 382-385, 387-397.

On July 26, 2002, Dr. Smith recommended that she continue with therapy two times per week for the next four weeks.  Record at 365.  She did that and more – her records show sessions from July 29, 2002 through May 6, 2003.  Record at 398-428.  Though Ms. Lang had therapy several times each month, there is never really any indication in the progress notes that the sessions were doing much good in terms of the overall stated goal of decreasing pain and increasing functioning.  At times – for example, throughout September, October and November of 2002 – progress notes indicate that Ms. Lang "continues to improve"; but those same notes also indicate that "spasms and distress [are]

8

still present." Record at 403-411. Nor is there any indication
that her course of treatment is coming to any sort of conclusion;
after each session, her therapist simply recommends "continued
therapy."

On April 30, 2002, Dr. Smith completed an FMLA form for Ms.
Lang, noting that she was "presently disabled" and that it was
difficult to say how long her disability would last; he noted
that her condition was "chronic" and that her care was dependent
upon "her functional reserves and capacity to sustain a normal
work routine." Record at 377. He completed another form the
next month, indicating that Ms. Lang was still disabled and
likely to remain so for another 4 to 6 weeks. Record at 379.

On May 9, 2002, Dr. Charles Slack, of Midwest Orthopaedics,
ordered a lumbar MRI for Ms. Lang. Record at 368. She had the
MRI on May 22, 2002; it revealed

> straightening of the normal lumbar lordosis. No
> significant stenosis at the L1-2 or L2-3 levels. At
> L3-4, there is mild disk bulge with facet arthritis and
> ligamentum hypertrophy causing minimal narrowing of the
> neural foramen. There is a small amount of fluid
> within the facet joints. At L4-5, there is broad based
> disk bulge with more focal protrusion left laterally.
> There is facet arthritis and ligamentum hypertrophy
> causing moderate degree of canal stenosis with
> bilateral neural foraminal stenoses. There is a
> moderate amount of fluid within the facet joints. At
> L5-S1, there is a broad based disk bulge, slightly
> greater left of midline. There is mild facet arthritis
> and ligamentum hypertrophy. There is minimal narrowing
> of the neural foramen, left greater than right.

Record at 375, 456. On June 5, 2002, Dr. Slack wrote a prescription for her to obtain a lumbar epidural steroid injection. Record at 305. Dr. Slack opined that, at least during the months of May through November, 2002, Ms. Lang was "temporarily totally disabled." Record at 369-371, 373.

On September 24, 2002, Ms. Lang was examined by Dr. Thomas Gleason at the Illinois Bone and Joint Institute's Center for Orthopaedic Surgery; the purpose of the exam was "to determine her present status." Record at 475. At that time, Ms. Lang reported that she hurt her back on February 19, 2002, while on the job, when she twisted while getting some literature out of the trunk of her car; she reported that she had a low back injury about 30 years earlier, but that she did not have any low back complaints prior to the injury that occurred February 19, 2002. Record at 475-476. X-rays taken that day showed "Grade 1 degenerative spondylolisthesis L4-5 with moderate disc space narrowing and associated anterior osteoarthritic spur formation." Record at 477. The x-rays also showed "spurring to a lesser degree anteriorly at L3-4" and "facet arthropathy over the lower lumbar and lumbosacral spine." Record at 477-478. Dr. Gleason opined that, at that time, Ms. Lang was "capable of [] full time sedentary to light level work as well as other activities as desired limited in terms of prolonged standing, walking, heavy

10

lifting, extensive bending and repetitive twisting." Record at
478. He also opined that her functional limitations relating to
her lower back were "probably permanent." Record at 479.

On April 17, 2004, Dr. Smith wrote a "to whom it may
concern" letter indicating that Ms. Lang was injured on the job
and "suffers a persistent low back derangement associated with
L4-L5 spinal stenosis with a grade 1 spondylolisthesis." Record
at 434. He noted that "[p]rolonged sitting (driving), walking or
repetitive movements of the torso produce deep spasms and pain"
and indicates his advice that she limit her time in a car and
limit walking "to no more than 15 minutes to a half hour in a 4
hour period of time" because of "the mechanical stress" caused by
such activities. Record at 434. Such restrictions, he noted,
should remain in place for the next 12 weeks, during her
evaluation and treatment. Record at 434.

The record includes medical records documenting Ms. Lang's
visit to the emergency room at Little Company of Mary Hospital on
October 5, 2004; she arrived about 7:30 p.m. complaining of chest
and back pain after a car accident in which the air bag deployed.
Record at 261-262. On examination in triage, she was alert and
oriented, but remained on a backboard, with a hard cervical
collar for several hours and until x-rays could be taken. Record
at 278. She had a CT scan of her brain, which showed no

11

abnormalities. Record at 270. She also had a CT of her cervical spine, which showed no acute fractures or dislocations, but did reveal degenerative disc disease at C5-6 and, to a lesser extent, at C4-5. Record at 272. At about 10:30 that same night, she reported feeling "much improved" and the backboard and cervical collar were removed; she reported no back or neck pain at that time. Record at 278. Ms. Lang was discharged shortly after midnight and told to follow up with her primary care physician and to return if her symptoms got worse. Record at 279.

On October 23, 2004, Ms. Lang had MRIs of her brain and her "orbits" to explore her complaints of headaches. Record at 446-447. The results were normal and unremarkable. Record at 446-447.

After the accident, Ms. Lang returned to Dr. Smith. The record shows that Ms. Lang saw Dr. Smith regularly from November 15, 2004 through August 23, 2005, and then again from December 6, 2005 through July 1, 2006. Record at 314-345. Dr. Smith marked the date of loss as October 5, 2004, the date of Ms. Lang's car accident. From the notes, it appears that Ms. Lang was initially complaining of pain in her jaw, neck and upper back. Record at 345. She apparently received injections at each session, at least initially, and was prescribed other therapies as well; at her third session, on November 19, 2004, she reported that the

12

previous session had "seemed to help a lot" and that she was sleeping better; she reported that her pain continued however. Record at 345. By December 18, 2004, she reported "improvement in daily activity," though she continued to experience spasms of the jaw and back. Record at 341. On December 29, 2004, Dr. Smith noted "definite improvement in movements of the neck and back," though, again, the spasms were still present. Record at 340. In January 2005, Ms. Lang noted that the tension in her back had decreased from her last visit and "improved gross movements with a decease in over all tenderness of her lumbar muscle mass"; yet she still complained of recurrent muscle pain. Record at 339, 337. By February 10, 2005, she reported being able to "do more household things during the day"; she still complained of muscle spasms and recurrent pain. Record at 336.

At times, the notes suggest that Ms. Lang's pain is due to tissue damage (2/23/05); at others, bone damage (1/26/05); and, at others, "disc, facet and nerve damage" (e.g., 2/10/05, 2/15/05); regardless of her complaints or the cause, the plan is always "continue treatment." But, in March of 2005, the notes change; the subjective reporting is consistently "remains symptomatic" and the plan is always "symptomatic relief" – which of course tells very little about what was going on or what the treater planned to do about it. Record at 314-334.

Ms. Lang saw Dr. Smith once a month from September 18, 2007 through May 15, 2010. For the most part, she complained of headaches and pain in her jaw, mostly brought on by chewing and eating. Record at 501-507. She complained about back pain just once during this time period, on July 22, 2008. Record at 506.

On March 18, 2008, Ms. Lang completed a Physical Impairments Questionnaire, claiming that she could not lift "heavy skillets"; could not stand too long to cook food and that she could only stand "10 minutes w/o pain in legs + back." Record at 199. She also noted on the form that she could not "carry heavy items [such] as bottles of juice" and that she could not carry a laundry basket "any distance." Record at 199. She claimed that reaching caused dizziness; that she had trouble getting into and out of a car; that she could sit for just an hour and then had to get up and move around to relieve discomfort in her lower back. Record at 199-200. She also noted that she could stand for just 20 to 30 minutes before the pain in her legs and back got so bad she had to sit down; she stated that if she walks for one city block she has to rest before she can continue. Record at 200.

Ms. Lang also completed a Function Report on March 18, 2008, in which she represented that her daily activities consisted primarily of lying in bed. Record at 201-208. She stated that she gets up to go to the bathroom, to fix quick meals, to get

14

some fresh air and maybe go to the store; she otherwise stays in bed. Record at 201. She stated on the form that she used to be able to do household chores, she used to be able to walk, and even run; she is no longer able to do any of that. Record at 201-202. She also stated that, but for her pain medication, she would not be able to sleep. Record at 202. She indicated that she has no issues with personal care, that she prepares her own meals, is able to wash dishes, wipe off the table and counter top, and clean the sink. Record at 203. She indicated that she is no longer able to do yard work because she cannot bend or stoop. Record at 204. She indicated that she goes out every day, that she is able to drive and ride in a car, that she is able to shop for groceries and personal care items, that she is able to pay bills and generally manager her finances. Record at 204. She indicated that she enjoys reading, listening to music, doing puzzles, watching tv, going to church and singing in the choir. Record at 205. She indicated that she is able to do all of these activities, except sing in the choir; she is no longer able to stand and sway. Record at 205. She indicated that she is able to visit with friends and shop, attend church and bible study. Record at 205. On the list of items affected by her impairments, Ms. Lang checked 9 of the 19 boxes: lifting, squatting, bending, standing, reaching, walking, sitting,

kneeling and stair climbing. Record at 206. Among those she did not check were concentration, memory, completing tasks and using hands. Record at 206. In fact, she indicated that she is able to pay attention for "as long as necessary." Record at 206. She completed another Function Report on September 17, 2008; it was substantively the same as the March 2008 report. Record at 220-227.

Ms. Lang underwent an Internal Medicine Consultative Examination with Dr. M.S. Patil on May 15, 2008. Record at 299-302. To prepare his report, Dr. Patil spent 30 minutes with Ms. Lang and reviewed her records. He noted that she complained of "mild to moderate pain and stiffness in her upper and lower back area" from a lifting injury in 2002 and a car accident in 2004; at the time of the examination, Ms. Lang rated her pain at an 8 on a scale of 0-10. Record at 299. She reported having "mild to moderate difficulty walking more than 1-2 blocks, bending and lifting more than 5 lbs., standing or sitting for more than thirty minutes and climbing stairs. Record at 299. Dr. Patil also noted that Ms. Lang had suffered from hypertension for more than 15 years; he noted that she was hospitalized for a heart attack in 1997, underwent an angioplasty with two stent implants, and had been compliant with her blood pressure medications. Record at 299. Dr. Patil observed Ms. Lang to be "a moderately

16

built, obese, right-handed female" with normal speech and gait and no physical abnormalities; with regard to her mental status, he similarly noted no abnormalities. Record at 300. Her cervical and lumbar spine range of motion were within normal limits. Record at 301. She used no assistive device for walking, was able to walk normally and even squat, with some difficulty. Record at 301. Dr. Patil opined that Ms. Lang suffered from "moderate to advanced degenerative disc disease" and he observed:

> Limitations of ROM's are quantified. There is no deformity, swelling, tenderness or redness of any joint. Peripheral pulses and sensation are normal bilaterally. There is no shortening of extremities or atrophy of extremity muscles. No recent trauma is noted. Gait, speech, hand dexterity and mentation are normal. Cervical spine x-ray done in Aug. 2011 at Rockford Medical Imaging showed extensive degenerative change of the cervical spine from C4 to C7. X-ray of thoracic spine showed minimal degenerative change. She received steroid injection in June 2002. Record at 302.

He also noted that:

> X-ray of lumbosacral spine done today showed grade I anterolisthesis of L4 on L5. Vertebral body heights were maintained. No compression fractures. There was marked loss of disc height at L4-L5 with vacuum disc formation and degenerative endplate sclerosis. Mild to moderate disc space narrowing at L3-L4. Mild disc space narrowing at the remaining lumbar levels. Endplate spurring throughout the lumbar spine. Multilevel lumbar facet arthrosis, most pronounced at the L4-L5 and L5-S1 levels. Mild artherosclerotic calcifications were identified in the abdominal aortic distribution. Record at 302.

17

The records from Oak Lawn MR & Imagine Center, dated May 15, 2008, indicate "Grade I anterolisthesis of L4 on L5. Moderate to advanced degenerative disc disease at L4-L5, mild to moderate degenerative disc disease at L3-L4, and relatively mild degenerative disc disease at the remaining lumbar levels. Multilevel lumbar facet arthrosis, most pronounced at the lower lumbar levels. No lumbar compression fractures." Record at 303.

On May 22, 2008, Dr. Virgilio Pilapil, a non-examining consultative physician, completed a Physical RFC Assessment for Ms. Lang based on his review of her medical records. Record at 306-313. Dr. Pilapil determined that Ms. Lang could frequently lift or carry 10 lbs. and occasionally lift or carry 20 lbs.; that she could sit, stand and/or walk about 6 hours in an 8-hour workday; and that she had no limitations in her ability to push or pull. Record at 307. Dr. Pilapil noted that Ms. Lang could never climb ladders, ropes or scaffolds, could occasionally climb stairs, stoop, kneel, crouch and crawl. Record at 308. Dr Pilapil based this assessment on the fact that Ms. Lang was "able to ambulate 50 feet unassisted with normal tandem gait, walk on heels and toes, and can rise from a seated chair. The fine manipulative and gross handling are intact, and muscle/motor strength is full (5/5) in upper and lower extremities." Record at 307. He also noted that Ms. Lang had "difficulty squatting

18

and arising on examination." Record at 308. Dr. Pilapil noted no manipulative, visual, communicative or environmental limitations, Record at 309-310. In the "additional comments" section of the report, Dr. Pilapil noted that Ms. Lang had a BMI of 35.7, that she was able to ambulate unassisted for greater than 50 feet with normal tandem gait; that the motor strength in her upper and lower extremities was intact, with normal fine manipulation and gross handling; that she had full range of motion in all joints, except she had "mildly diminished flexion in the knees." Record at 313. Dr. Pilapil noted that, according to her May 15, 2008 x-rays, Ms. Lang had moderate to advance[d] degenerative changes at the L4/L5 disc levels and mild to moderate disc disease at the L3/L4 levels." Record at 313. He also noted that her "allegations are credible and supported by the objective medical evidence, with no inconsistencies." Record at 313.

On June 25, 2008, Ms. Lang had another scan done on her spine; no fractures were noted, though the scan did show "moderate degenerative changes with mild spondylolisthesis of L4 upon L5. Also facet arthropathy, marginal sclerosis and posterior osteophytes." Record at 460.

On July 21, 2008, Dr. David Goldberg completed a Physical Residual Functional Capacity Questionnaire for Ms. Lang. He

19

first indicated that he had seen Ms. Lang about 4 times per year since about 1996. Record at 466. Based upon his experience and treatment of Ms. Lang, Dr. Goldberg indicated that Ms. Lang's symptoms were frequently severe enough to interfere with the attention and concentration needed to perform even simple work tasks. Record at 467. He further indicated that Ms. Lang was capable of low stress jobs, able to walk 1.5 blocks at a time, able to sit for one hour and stand for just 15 minutes before having to shift or move; he also indicated that she could sit for a total of about 4 hours in an 8-hour work day and could stand/walk for less than two hours total in an 8-hour workday. Record at 467. He indicated that she would need to take frequent breaks during an 8-hour workday, roughly 4 or 5 breaks every 1 to 2 hours. Record at 468. He noted that she would be required to elevate her legs with prolonged sitting, and also indicated that she did not require a cane or any other assistive device for walking or standing. Record at 468. Dr. Goldberg indicated that Ms. Lang could never lift 10 lbs. or more and could only rarely lift items weighing less than 10 lbs.; he indicated that she could frequently look down, turn her head or hold her head in a static position, that she could never climb ladders and only rarely twist, stoop, crouch/squat or climb stairs. Record at 468. Finally, he indicated that Ms. Lang had good days and bad

days, and that the bad days would require her to be absent from work about three days per month.  Record at 469.

Dr. Jason Smith completed a Physical Residual Functional Capacity Questionnaire on August 17, 2009.  Initially, Dr. Smith indicated that he saw Ms. Lang at least monthly and sometimes more; he listed her symptoms as headaches, jaw pain and neck pain and noted that they would "occasionally" interfere with the attention and concentration required to do even simple work tasks.  Record at 470-471.  He indicated that she was capable of high stress work, that she could sit for just 15 minutes and stand for just 45 minutes before needing to shift or move, and that she could sit and stand/walk for less than 2 hours total in an 8-hour workday.  Record at 471-472.  Dr. Smith further indicated that Ms. Lang could never lift 20 or 30 lbs., could occasionally lift 10 lbs., and could frequently lift items weighing less than 10 lbs.  Record at 472.  He indicated that she could occasionally look down or up and turn her head and frequently hold her head in a static position; he also indicated that she could rarely crouch or climb ladders, could twist and stoop occasionally to frequently, and could frequently climb stairs.  Record at 473.  He indicated that Ms. Lang's "bad days" would require her to miss more than 4 days of work per month. Record at 473.  Finally, Dr. Smith noted that Ms. Lang had

21

learned to cope with her TMJ and cervical muscle spasms, but that she remained disabled. Record at 473.

Dr. Smith completed another Physical Residual Functional Capacity Questionnaire on January 26, 2010. This time, he indicated that Ms. Lang's symptoms seemed to be increasing with age and that her symptoms would now frequently interfere with her ability to do even simple work tasks. Record at 481. He indicated that she could now handle just moderate (not high) stress, could sit for just 15 minutes before having to move or stand, and could sit and stand for less than two hours total in an 8-hour workday. Record at 481-481.

The record also includes a Work History Report for Ms. Lang; it lists five jobs: licensing tech at CNA from 1984 through 1995; tax preparer from 1995 to 2001; community outreach from 1996-1997; parent liaison at a clinic for disabled children from 1997 to 2002; and relief manager at Public Storage from August 2003 through October 2004. Record at 191-198.

The record before the ALJ also includes a memorandum from Ms. Lang's attorneys dated May 12, 2010. Record at 246-251. There, after summarizing the relevant procedural and medical histories, counsel for Ms. Lang argued that she was incapable of performing her past work as a community aide, a licensing tech or a tax preparer; similarly, counsel argued, her limitations

22

precluded her from performing even unskilled sedentary work.
Record at 246-251. In particular, counsel argued, Ms. Lang cannot
sit, stand or walk for any prolonged period of time, cannot lift
more than 10 lbs., and is limited in moving her head and using
her upper extremities; her headaches and pain also affect her
ability to concentrate and function. Record at 250-251. Based
upon this, and upon the record as a whole, counsel urged the ALJ,
in advance of the hearing, to "render a fully favorable decision
finding the Claimant disabled and entitled to the disability
benefits for which she applied." Record at 251.

The ALJ issued his decision on August 20, 2010, denying Ms.
Lang's claims for DIB and SSI. The ALJ determined that Ms. Lang
met the insured status requirements on December 31, 2009; that
she had not engaged in substantial gainful employment since
October 5, 2004; and that she suffered from degenerative disc
disease, a severe impairment, as well as hypertension and
mandibular associated jaw pain, neither of which were severe.
Record at 23-24. The ALJ determined that Ms. Lang's impairments
did not meet or equal a listed impairment; in particular, with
regard to Ms. Lang's disc disease, the ALJ determined that she
did not meet the listing because she did not "exhibit herniated
discs or particularly severe spinal stenosis associated with such
(required) symptoms as serious limitation of lumbar/cervical

23

range of motion, motor loss (atrophy with associated muscle weakness) or sensory or reflex loss." Record at 24.

The ALJ determined that, despite her complaints of pain, Ms. Lang was capable of performing her past work as a community worker, a storage facility rental clerk and a license clerk. Record at 26-27. In particular, the ALJ determined that Ms. Lang had the RFC "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) – i.e., the claimant can lift and/or carry 20 pounds on an occasional basis and 10 pounds frequently; she can stand and/or walk for about six hours during the course of an eight hour workday; and she can sit for about six hours during the course of an eight hour workday, with only normal rest periods except she should avoid working at heights or climbing ladders and can only occasionally negotiate stairs, she can only occasionally stoop, kneel, squat, crouch or crawl and she should not be exposed to moving or dangerous machinery." Record at 24. Indeed, the ALJ determined, even if he were to accept Ms. Lang's testimony concerning her limitations (that she could lift just 2 to 4 pounds, that she could sit for just 35 minutes at a time, stand for 45 minutes at a time and walk just two blocks at a time), he would nonetheless find, based on the testimony of the VE, that she could perform her past work as a licensing clerk – at least as she, according to her testimony, performed it.

24

Record at 27-28.

After the Appeals Council denied review, Ms. Lang filed a lawsuit in this Court, seeking review of the Social Security Administration's final agency decision.  The parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on November 14, 2011.  The case is now before the Court on summary judgment: Ms. Lang asks the Court to reverse the Commissioner's decision denying her benefits, or to remand the matter for further proceedings; the Commissioner seeks summary judgment affirming the agency's decision.

Discussion

Applicable Law

An individual claiming a need for DBI or SSI must prove that she has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as

26

a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

27

<u>Analysis of Ms. Lang's Arguments</u>

Ms. Lang argues that the ALJ's decision should be reversed or remanded because he failed properly to weigh and consider all of the evidence of record in making his RFC determination; failed to make a proper credibility determination; and made an erroneous determination at Step 4.

1.   <u>The ALJ's RFC Determination</u>

Ms. Lang first argues that the ALJ's RFC determination was wrong and not supported by the evidence of record.  In particular, Ms. Lang argues that the ALJ improperly rejected the evidence and opinions from Dr. Smith and Dr. Goldberg, who treated Ms. Lang, and relied instead on incomplete evidence and opinions provided by state agency consultants.

Ms. Lang is correct that, when assessing her limitations, the ALJ gave greater weight to the opinion of Dr. Pilapil than to the opinions of Dr. Smith or Dr. Goldberg.  The ALJ explained that he was giving little weight to Dr. Smith's opinion of Ms. Lang's limitations because he only treated her for her TMJ and jaw pain.  As Ms. Lang points out, this is not entirely true.  To be fair, Dr. Smith's treatment notes during the period beginning September 18, 2007 and going through May 15, 2012, do primarily focus on Ms. Lang's TMJ, jaw/neck pain, and the headaches associated therewith.  During that almost three year period, she

28

complained about back pain just once – on July 22, 2008. Similarly, from March 22, 2005 through July 1, 2006, Ms. Lang's therapy with Dr. Smith focused exclusively on "mandibular joint fracture, headaches, neck/shoulder pain." She never once complained of back pain during that time. The earlier records – those dating from 2001, 2002, 2003, the latter half of 2004 and the early part of 2005, do address back pain and tenderness and do focus on improving range of motion in the spine, as well as relieving back pain. Thus, the ALJ was not really wrong when he noted that Dr. Smith focused on Ms. Lang's TMJ; but he does appear to have been limiting his analysis to the later records.

Additionally, although Dr. Smith indicated in his RFC Questionnaire that Ms. Lang's symptoms seemed to be getting worse with age, his progress notes suggest that, at least with respect to her back, her symptoms were rarely an issue. Certainly, there is nothing in Dr. Smith's treatment and progress notes during this time frame that would support the extremely severe limitations he quoted in his Physical RFC Questionnaire. The ALJ noted as much, and his puzzlement over the inconsistency is understandable.

The ALJ also dismissed Dr. Goldberg's opinion concerning Ms. Lang's limitations, finding that his assessment of such severe limitations was not supported by the objective medical evidence.

29

This is true – as will be explained below, even the evidence Ms. Lang cites here confirms that her symptoms were consistently characterized as mild to moderate.  And, significantly, even Dr. Goldberg opined that she was capable of full time work.

Ms. Lang does challenge the ALJ's characterization of her degenerative disc disease as "not particularly serious."  Yet she does not challenge any of the evidence upon which that conclusion was based.  To meet Listing 1.04(A), a claimant must present evidence of a spine disorder that results in compromise of a nerve root or the spinal cord with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). The listings note that an "[i]nability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss" as well as concrete evidence of atrophy in upper and lower extremities. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(E)(1).  There is no question that Ms. Lang's degenerative disc disease did not meet the listing; she had no nerve root compression, no limitation of

30

motion of the spine, no motor loss, and no sensory or reflex loss.  She does not argue otherwise.

The ALJ noted that her records showed no herniated discs and no particularly severe spinal stenosis; she does not disagree with these findings.  The ALJ also noted that the evidence did not reveal any association with symptoms such as serious limitation of lumbar/cervical range of motion, motor loss (atrophy with associated muscle weakness) or sensory or reflex loss.  She does not challenge these findings; nor does she point to any evidence that contradicts or undermines these findings. The evidence she does cite confirms that her limitations were "mild" or "moderate."  It was not unreasonable to characterize them as "not particularly serious."  That is not the same as saying she doesn't have any issues – she clearly does.  But those issues are not so severe that they consistently limit her ability to do any work.

2.  The ALJ's Credibility Determination

Next, Ms. Lang challenges the ALJ's determination that her complaints were not fully credible. She argues that the ALJ dismissed her credibility based solely on objective factors.  And that does appear to be the case.  The ALJ found that "[s]imply put, the objective medical evidence does not establish physical abnormalities to produce the serious physical limitations the claimant alleges."  Record at 26. He then goes on to detail the objective medical evidence and how it shows Ms. Lang to be a relatively healthy person with some relatively minor issues.  He does not discuss her complaints of disabling pain; nor does he discuss her obesity.

An ALJ "may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)(citing SSR 96-7p; 20 C.F.R. §404.1529(c)(2); *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006); *Clifford v. Apfel,* 227 F.3d 863, 871-72 (7th Cir. 2000)).  Yet that is precisely what the ALJ did here.  He did not discuss Ms. Lang's complaints of disabling pain; nor did he discuss (or even mention) her obesity.  "In determining credibility an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors,

medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c); SSR 96-7p; *Steele v. Barnhart*, 290 F.3d 936, 941-42 (7th Cir. 2002)). "Additionally, under SSR 02-1p the ALJ must specifically address the effect of obesity on a claimant's limitations because, for example, a person who is obese and arthritic may experience greater limitations than a person who is only arthritic." *Villano*, 556 F.3d at 562 (citing *Barrett v. Barnhart,* 355 F.3d 1065, 1068 (7th Cir. 2004)). The ALJ's failure to discuss either issue here is troubling, as both could have a significant impact on his credibility determination. Accordingly, although it is true that the objective medical evidence did not support the severe limitations claimed by Ms. Lang, it is also true that both her pain and her obesity could have impacted the ALJ's credibility findings and should at least have been considered. Because the ALJ failed to consider these additional factors, remand is appropriate.

   3.   The ALJ's Step 4 Determination

   Finally, Ms. Lang challenges the ALJ's determination, at step 4, that she could perform her past relevant work. In particular, Ms. Lang argues that the ALJ failed to make any findings concerning whether she could perform those jobs as she performed them, or whether she could perform the jobs as they

33

were generally defined in the DOT. Not true. The ALJ discussed the jobs both as performed and as generally defined and noted the differences where they existed. The only job where this was an issue was the licensing clerk job, which was classified by the DOT as light work, but was sedentary as performed by Ms. Lang. He determined, based in large part on the testimony of the VE and the testimony of Ms. Lang, that she was capable of performing the job as she had performed it. Record at 27-28. The Court, therefore, rejects this argument.

Ms. Lang also argues that her medication and her impairments and symptoms would prevent her from doing her past relevant work; she claims that she can no longer do skilled or semi-skilled work "due to her pain and other limitations affecting concentration and attention" and that the ALJ was, therefore, wrong to find that she could do that work. Reply, p.8. Yet, by her own admission, that is simply not true. In March of 2008, she completed a questionnaire that asked about her functional limitations. She checked a number of boxes indicating the many ways in which she is limited. But among those she did not check were concentration, memory, completing tasks and using hands. Record at 206. In fact, she indicated that she is able to pay attention for "as long as necessary." Record at 206. In short, the ALJ's finding that she could still do more than unskilled

34

work was supported by her own testimony and her own assessment of her abilities.

Having said this, on remand, the Commissioner will need to revisit the RFC determination based upon any new credibility findings and after considering Ms. Lang's subjective complaints of pain and the impact, if any, of her obesity on her ability to work.

<u>Conclusion</u>

For the reasons set forth above, the Court finds that the ALJ erred when he based his credibility findings exclusively on the objective medical evidence. Consistent with the rulings and regulations, the ALJ should have considered Ms. Lang's subjective complaints of pain, and he also should have considered the potential impact of her obesity on her abilities and limitations. Because he did not, remand is appropriate. The Court grants Ms. Lang's motion for summary judgment [#25] and denies the Commissioner's motion for summary judgment. The case is remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

Dated: December 10, 2012

E N T E R:

ARLANDER KEYS
United States Magistrate Judge

35